IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANONA DUFFY, et al., | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| LAWYERS TITLE INSURANCE CO., | : | No. 11-4503 |
| Defendant. | : | |

# M E M O R A N D U M

**Stengel, J.**                                                                    **September 17, 2013**

Plaintiffs are a group of individuals who were caught up in a "mortgage rescue

scam" to save their homes from foreclosure, which resulted in criminal prosecutions of a

number of individuals.  They brought this civil action against Lawyers Title Insurance

Company n/k/a Fidelity National Title Insurance Company for fraud and violation of

Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL").  For

the reasons discussed below, I will grant defendant's motion for summary judgment.

## I.       Background

In their amended complaint, plaintiffs alleged they were victims of a series of

foreclosure rescue scams, described as "equity skimming scams."  Plaintiffs claim that

Lawyers Title Insurance Co. ("Fidelity")  is a wholly owned division of Fidelity National

Title Insurance Co.,[1] that Fidelity is also the principal, insurer and underwriter of First

County Abstract,[2] and that these and other parties conspired to steal the equity in

---

[1] Fidelity is acting in its own name and as the entity into which Lawyers Title was merged.

[2] First County Abstract is a fictitious name filed in 2005 with the Commonwealth of Pennsylvania and is to be
traded under Bennett & Doherty, P.C.

plaintiffs' properties. Specifically, Jeffrey Bennett and Steve Doherty functioned as title agents and as principals of Bennett & Doherty, P.C., a firm acting as an alter ego and trading as First County.

Each plaintiff was in the midst of a foreclosure action commenced by their respective lenders when the equity scams took place.[3] Plaintiffs allege that they were contacted by Edward McCusker or Bennett & Doherty, P.C. Mr. McCusker told them that they could save their home from foreclosure by refinancing under a third party's name and eventually, by refinancing the mortgage in their own name, restore their own credit. Plaintiffs who were contacted by Bennett & Doherty were led to believe that they were being represented by a law firm to defend their bankruptcy and mortgage foreclosure actions. When their "defense" was no longer viable, the firm referred plaintiffs to Mr. McCusker in order to affect the scheme described above. Plaintiffs were then referred to Bennett & Doherty, P.C., who traded as title insurance agents for First County—a title insurance company.

In these transactions, the third party was simply a "straw party" with good credit to act as the purchaser of the plaintiffs' respective residences. Plaintiffs were permitted to remain in their homes under the terms of a lease executed as a part of the transaction. Although plaintiffs were told they would be able to buy back their homes within a year,

---

[3] Individual plaintiffs include: Anona Duffy (Amend. Compl. at ¶¶ 50-75), John and Marie Iacovetti (Amend. Compl. at ¶¶ 76-88), George and Jorene Devlin (Amend. Compl. at ¶¶ 89-101), Kim Mellus Harak (Amend. Compl. at ¶¶ 102-115), Michael and Joann Lieber (Amend. Compl. at ¶¶ 116-123), Jose and Carmen Ortiz (Amend. Compl. at ¶¶ 124-141), Mark and Beverly Goldman (Amend. Compl. at ¶¶ 142-152), Susan Edge (Amend. Compl. at ¶¶ 153-163), William and Phyllis Kemp (Amend. Compl. at ¶¶ 163-173), and Tracey and John Vogt (Amend. Compl. at ¶¶ 174-183).

none of them could articulate how that would take place. Settlement for each transaction was scheduled with Bennett & Doherty and was scheduled for closing at their offices. Preceding settlement First County, through Bennett, issued a preliminary HUD-1 settlement sheet, which set forth costs and showed a "cash-to-seller" payment allegedly illustrating the amount of equity in each home. This prompted the release of the settlement funds.

After the funds were released, First County, through Bennett, issued a phony final HUD-1, which reduced the proceeds paid to plaintiffs to zero. Specifically, the defaulting mortgage was paid off through financing provided by J.P. Morgan Chase, who then obtained a new mortgage on the property.[4] Settlement costs including title insurance, taxes, and hazard insurance were paid. Specifically, title insurance was issued by Fidelity through its agent First County which insured the lien on the new mortgage. The proceeds of the new mortgage were then used to pay off the old mortgage and to satisfy other "obligations." However, these obligations were phony payoffs, which were diverted to disinterested third parties involved in the scheme.

Plaintiffs claim that Fidelity was imputed with the knowledge of these scams through their agents, First County and Bennett & Doherty, and that defendant must have audited at least one of these transactions and failed to identify the fraud. Plaintiffs also allege that defendant did not question, reject, investigate, or attempt to determine whether the HUD-1 transactions were scams. They argue that they are purchasers of title

---

[4] Plaintiff alleges that J.P. Morgan Chase was a successor in interest to Washington Mutual Bank, of which the lender was Long Beach Mortgage a division of Washington Mutual Bank. (Plaintiffs' Exhibit U at ¶¶ 18-27).

insurance under the UTPCPL because the equity in their homes was used to buy the policies that were part of this fraudulent transaction. Defendants argue that plaintiffs cannot be considered purchasers because there is no evidence concerning whether the equity was used to purchase the settlement costs. However, even if it was used, defendant argues that plaintiffs simply cannot satisfy the requirements of justifiable reliance and damages.

## I.  Procedural Background

There was a series of complaints filed by plaintiffs in Bucks County, Pennsylvania, including four other actions that have been stayed pending federal criminal proceedings.[5] Plaintiffs filed the current action in the Court of Common Pleas of Bucks County, naming Fidelity and Lawyers Title Insurance as separate defendants. Fidelity filed a Notice of Removal on July 14, 2011.[6] Plaintiffs filed an amended complaint in response to defendant's first motion to dismiss. Defendant then filed a motion to dismiss,

---

[5] Stephen Doherty has pled guilty to federal racketeering and bankruptcy fraud charges, and Jeffrey Bennett has pled guilty to federal racketeering charges. (Amend. Compl. at ¶ 3). The McCuskers proceeded to trial and were found guilty on all counts, save one count against Ms. Jacqueline McCusker. Sentencing is still pending for the McCuskers, Bennett, and Doherty. Fidelity was not involved in any criminal proceedings.

[6] There have been numerous state court actions relating to this matter. In 2007, the Kemps filed a state action against several defendants, including Bennett, Doherty, First County, and Edward McCusker asserting various claims including the UTPCPL. In 2008, the Kemps filed an additional action, and in 2009 the Kemps along with a number of other plaintiffs in this action filed a third action against several defendants. All of these actions were consolidated and stayed in 2010 along with a fourth action filed by a number of other plaintiffs. In 2012, the stay was lifted, and the court dismissed the claims against some of the defendants.

The Kemps also filed a class action in 2008 against multiple defendants. Lawyers Title was voluntarily dismissed early on in the action and eventually the remaining parties entered into a stipulation and voluntarily dismissed the action with prejudice.

which I denied.  The motion to dismiss was denied without prejudice to submit a renewed

motion, if one was warranted in light of the facts obtained through further discovery.[7]

The defendant filed a motion to certify the "purchasers" issue for interlocutory

appeal as a question of law.  I denied this request because this is an issue of first

impression for the Third Circuit, which does not justify an interlocutory appeal.  Larsen

v. Senate of Commonwealth of Pa., et al., 965 F. Supp. 607, 609 (M.D. Pa. 1997).

Further, the case was in the early stages of discovery when defendant filed the motion.  I

held that the first inquiry was not whether plaintiffs are "purchasers" under the act, but

whether the equity in their homes was used to purchase the title insurance.[8]  Following

discovery, I heard oral argument on the motion for summary judgment.

## II.    Standard

Summary judgment is appropriate "if the movant shows that there is no genuine

dispute as to any material fact and that the movant is entitled to judgment as a matter of

law."  FED. R. CIV. P. 56(a).  A dispute is "genuine" when "a reasonable jury could return

a verdict for the nonmoving party" based on the evidence in the record.  Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" when it

"might affect the outcome of the suit under the governing law."  Id.

---

[7] The parties disagree as to whether plaintiffs qualify as purchasers under the UTPCPL. The order denying the motion to dismiss noted that, through discovery, the parties should attempt to determine what funds were used to purchase the title insurance and whether plaintiffs can be considered purchasers under the statute.

[8] Although I denied the request for interlocutory appeal based on the undeveloped factual issue concerning the whether the equity in plaintiffs' homes was used to purchase title insurance, I did not indicate that answering that question in the affirmative automatically qualified plaintiffs as "purchasers" under the Act.  Because this is an issue of first impression and the parties were in the early stages of discovery, I declined the request for an interlocutory appeal and will now address the issue on a full factual record.

A party seeking summary judgment initially bears responsibility for informing the court of the basis for its motion and identifying those portions of the record that "it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met simply by demonstrating to the district court that "there is an absence of evidence to support the non-moving party's case." Celotex, 477 U.S. at 325. After the moving party has met its initial burden, the adverse party's response "must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e)(2). Summary judgment is therefore appropriate when the non-moving party fails to rebut by making a factual showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

Under Rule 56 of the Federal Rules of Civil Procedure, the court must draw "all justifiable inferences" in favor of the non-moving party. Anderson, 477 U.S. at 255. The court must decide "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Id. at 252. If the non-moving party has produced more than a "mere scintilla of evidence" demonstrating a genuine issue of material fact, then the court may not credit the moving party's "version of events against the opponent, even if the quantity of the [moving party's] evidence far outweighs that of its opponent." Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## III.    Discussion

1. Plaintiffs' Claim under the Unfair Practices and Consumer Protection Law

The parties disagree as to whether plaintiffs qualify as a purchaser of a good or service.  The "general purpose of the UTPCPL is to protect the public from fraud and unfair deceptive business practices."  Burke v. Yingling, 666 A.2d 288, 291 (Pa. Super. 1995).  Specifically, the UTPCPL protects a person who "purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or  practice declared unlawful by section 3 of [the] act . . . ." 73 P.S. § 201-9.2 (2011).  Courts have generally taken a broad approach to what constitutes a sale or a purchaser under the act,  see, e.g., Christopher v. First Mut. Corp., No. 05-0115, 2008 U.S. Dist. LEXIS 32781 (E.D. Pa. Apr. 21, 2008); however, the UTPCPL requires a purchase of goods or services for household use.  Balderston v. Medtronic Sofamor Danek, Inc., 285 F.3d 238, 241 (3d Cir. 2002).  Moreover, an individual must establish that "he or she suffered damages arising from the purchase or lease of goods or services."  Keller v. Volkswagen of America, Inc., 733 A.2d 642, 646 (Pa. Super. 1999) (citing 73 P.S. §201-9.2).

Of the twenty-one total unfair or deceptive acts or practices, plaintiffs allege that the defendant violated P.S. § 201-2(4)(xxi), "engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding."  This "catchall" provision has been recognized as applying to some residential real estate

transactions.[9]  See, e.g., In re Barker, 251 B.R. 250, 261-62 (Bankr. E.D. Pa. 2000).

However, the facts of this case are distinguishable from earlier real estate cases.[10]  The

issue of whether the UTPCPL permits a person, who was attempting to refinance his

home and whose home's equity was allegedly used by one entity to purchase title

insurance from a third party, to bring suit against that third party is an issue of first

impression.

The UTPCPL does not define "purchaser," but the statute unambiguously permits

only persons who have purchased or leased goods or services to sue.[11]  Katz v. Aetna

Cas. & Sur. Co., 972 F.2d 53, 55 (3d Cir. 1992).  Additionally, "the cause of action is

limited to unfair or deceptive methods, acts, or practices in the conduct of any 'trade or

commerce' . . . . Had the Pennsylvania legislature wanted to create a cause of action for

those not involved in a sale or lease, it would have done so."[12]  Id.

In DeFazio v. Gregory, 836 A.2d 935 (Pa. Super. 2003), a landowner and a logger

disputed whether their contract was a contract for the sale of timber on a portion of the

---

[9] See also Wilson v. Parisi, 549 F. Supp. 2d 637, 666 (M.D. Pa. 2008) ("A deceptive act [under the UTPCPL] is the act of intentionally giving a false impression or a tort arising from a false representation made knowingly or recklessly with the intent that another person should detrimentally rely on it.").

[10] The UTPCPL has been applied to loan refinancing.  See, e.g., In re Barker, 251 B.R. at 261 (loan broker clearly violated UTPCPL by failing to disclose detrimental effect of refinancing loan).

[11] In Wise v. Am. Gen. Life Ins. Co., No. Civ.A 04-3711, 2005 WL 670697, at *7 n. 7 (E.D. Pa. Mar. 22, 2005), the court indicated that a private right of action under the UTPCPL was limited, and stated that:

Clearly, § 201-9.2 was drafted to provide a private right of action to a circumscribed class of consumers injured by unlawful or deceptive trade practices, relying on actions by the attorney general to remedy practices affecting other members of the public-at-large, including potential consumers.  See Lauer v. McKean Corp., 1989 WL 206448, at * 2 (Pa. Com. Pl. June 12, 1989).

[12] It is important to note that there is no strict requirement of privity under the statute.  Valley Forge Towers S. Condo. v. Ron-Ike Foam Insulators, Inc., 574 A.2d 641, 644 (Pa. Super. 1990).

landowner's property or whether it was a contract for the logger's timber cutting services. The appellate court found that the plain language of the contract established that the landowner was the seller and that the logger was the buyer. In so holding, <u>DeFazio</u> relied upon Webster's Dictionary definition of "purchase," which is "to obtain (as merchandise) by paying money or its equivalent." <u>Id.</u> at 939. Therefore, the landowner was a seller and not a purchaser, and § 201-9.2(a) did not provide relief to the landowner.[13]

In <u>Schwarzwaelder v. Fox</u>, 895 A.2d 614 (Pa. Super. 2006), the Superior Court of Pennsylvania considered who could qualify as a purchaser under the UTPCPL. In that case, the sellers argued that the protections of the UTPCPL should be expanded to include those parties who pay for a good or service indirectly, even if they did not actually acquire or obtain the good or service because their money was used to pay the commission.[14] Specifically, the Schwarzwaelders contracted with Howard Hanna Real Estate Services for participation in a listing service. <u>Id.</u> at 616. In exchange, the listing real estate brokerage agreed to pay any licensed realtor or agency that produced a buyer

---

[13] The court went on to say,

> The terms of the UTPCPL sections are unambiguous. Section 201-7 protects the "buyer" who purchases goods or services at the buyer's residence. Though the UTPCPL does not define the term "buyer," we can be certain that it does not mean seller. Furthermore, we conclude that "purchases" in Section 201-9.2 cannot be defined as "sells."

<u>DeFazio</u>, 836 A.2d at 939.

[14] Similarly, in <u>Morrison v. Wells Fargo Bank, N.A.</u>, 711 F. Supp. 2d 369, 384 (M.D. Pa. 2010), the plaintiff argued that Wells Fargo's willful refusal to remove a mortgage, which was paid in full, when notified of the error was the economic equivalent of a purchase. The court found that, although creative, the argument was not persuasive. It held that in connection with the mortgage, the plaintiff simply was not a purchaser or lessee of goods or services. <u>Id.</u> at 384.

for the subject property from the proceeds of the sales commission paid by the seller.[15]
Id.

Following the sale, the Schwarzwaelders learned that the alleged agent did not hold a realtor's license and was actually the buyer's wife. The Schwarzwaelders filed suit, claiming that the acts and omissions of the defendants violated the UTPCPL and they should be considered purchasers under the Act because a portion of the real estate commission they paid was remitted to the buyer's agent. Id. at 617. The court found for defendants, holding that the sellers were not purchasers simply because a portion of the real estate commission that they paid was eventually remitted to the buyer's agent. Id. at 620.

In this case, defendant argues the plaintiffs are not purchasers under the UTPCPL because plaintiffs were the sellers of property in various real estate transactions and as part of those transactions, Fidelity provided a title insurance policy to J.P. Morgan, not to plaintiffs. Therefore, plaintiffs did not purchase, and Fidelity did not sell to plaintiffs any goods or services in the allegedly fraudulent transaction. In fact, at deposition, none of the plaintiffs thought that they were purchasing or receiving title insurance and did not know what Fidelity was. Id. at ¶¶ 127-128, 157, 178, 234, 263, 290, 314.

Defendant argues that there is no dispute of fact that the equity in plaintiffs' properties was not used to purchase the title insurance. Plaintiffs sold their properties to the buyers, and First County caused the issuance of the policy to the buyers and the lenders, not to plaintiffs. Defendant states that the alleged stolen equity was diverted to

---

[15] Howard Hanna listed the Schwarzwaelders' property at $1,600,000; hence, the anticipated sales commission equaled $80,000, Hanna to pay half that amount to the seller's realtor.

third parties and not used to purchase the policies.  It was actually the mortgage financing provided by the lenders to the buyers that was used to purchase the title insurances.

Defendant cites to the HUD-1 Settlement Statements issued in each transaction showing the title insurance premiums were paid from the buyers' funds at settlement. Those funds were obtained from new financing provided by the lenders.  Defendant also states that no plaintiff testified at deposition that they believed they were buying title insurance or ever received a title insurance policy.  Finally, defendant contends that even if plaintiffs are found to be purchasers, they were not damaged through Fidelity's issuance of valid title insurance policies.

Plaintiffs argue that the general purpose of the UTPCPL is to protect the public from fraud.  They cite my opinion on the motion for interlocutory appeal where I stated that the UTPCPL does not define purchaser, but "generally, courts have taken a broad approach" to its interpretation.[16]  Duffy v. Lawyers Title Ins. Co., No. 11-4503, 2012 U.S. Dist. LEXIS 91271, at *5 (E.D. Pa. July 2, 2012) (Stengel, J.).  Plaintiffs maintain that funds from the homes' equity were used to purchase the title insurance and, therefore, even though they are not the insureds or the beneficiaries, they are indeed the

---

[16] In the motion to dismiss, I found that the "case law is not clear as to whether the issue presented in this case—whether a person whose home's equity was allegedly used by one entity to purchase title insurance from a third party—makes that person a 'purchaser' under the UTPCPL." Duffy v. Lawyers Title Ins. Co., No. 11-4503, 2012 U.S. Dist. LEXIS 23674, at *9 (E.D. Pa. Feb. 23, 2012).  Therefore, I declined to grant defendant's motion to dismiss as a matter of law.  I went on to deny an interlocutory appeal on the issue because the parties had yet to develop facts concerning whether plaintiffs' equity was used to purchase the title insurance.  While this information would change the analysis and potentially the outcome of the issue of whether plaintiffs qualify as purchasers under the act, I did not indicate that it would be dispositive of the legal claim.  While the motion to dismiss stage requires that I read all facts in the light most favorable to plaintiffs to determine if there is some inference of a facially plausible claim, the standard for summary judgment requires that the parties develop a record to support their allegations.

purchasers.[17]  Plaintiffs argue that, as consumers, they should be protected under the

UTPCPL and that the definition of a purchaser does include third-party payors.[18]

I disagree.  Plaintiffs concede that they were unaware that any title insurance was

even being purchased, but argue that their respective equity was used not only to

purchase the insurance but also to pay all settlement costs.[19]  Plaintiffs cite affidavits of

counsel, Mr. Stuart Eisenberg;[20]  Mr. John R. Thomas, a retired employee of the

Pennsylvania Department of Banking and Securities; John Bariana, an unindicted co-

conspirator; Jeffrey Bennett; and others.[21]  Other than these affidavits, plaintiffs have

---

[17] At oral argument plaintiffs cited to the criminal indictment which states, "The defendants obtained mortgage loans on residences of financially distressed homeowners using homeowners' equity to pay the cost of the transaction." Transcript of Oral Argument at 29 (Aug. 1, 2013); See also Grand Jury Indictment, Plaintiffs' Exhibit A.

[18] Plaintiffs cite AFSCME v. Cephalon, Inc. (In re Actiq Sales & Mktg. Practices Litig.), 790 F. Supp. 2d 313 (E.D. Pa. 2011), to support their claim that third party payors are protected under the UTPCPL.  However, this third party payor approach is a very specific relationship recognized in the drug manufacturing context.  See Am. Fed'n of State County & Mun. Emps. v. Ortho-McNeil-Janssen Pharms., Inc., No. 08-cv-5904, 2010 WL 891150, at *3-4 (E.D. Pa. March 11, 2010) (stating that Pennsylvania courts have long recognized the ability of third-party trusts and associations to assert UTPCPL claims on behalf of their constituent members).  The purchases are qualified in the respect that the third party payors purchased the prescription drugs on behalf of their members.

In this case, there was no commercial bargaining or exchange between plaintiffs and Fidelity. Plaintiffs did not contract with another party to provide goods or services for the buyer's benefit and plaintiffs are not the third-party beneficiary of any contract entered into by the buyer, J.P. Morgan, and Fidelity.  Consequently, plaintiff is not acting in a representative capacity as was the third party payor in AFSCME.  See Country Classics at Morgan Hill Homeowners' Ass'n v. Country Classics at Morgan Hill, LLC, 780 F. Supp. 2d 367, 376 (E.D. Pa. 2011) (citing Katz, 972 F.2d at 56-57 (noting that plaintiff lacked standing to sue under the UTPCPL where "[t]here was no commercial  bargaining or exchange" between plaintiff and defendant, and stating that "there is no indication the [Valley Forge Towers S. Condo. v. Ron-Ike Foam Insulators, Inc., 574 A.2d 641 (Pa. Super. 1990),] court would have extended the private cause of action to a plaintiff lacking any commercial dealings with the defendant")).

[19] Plaintiffs argue that the entire HUD-1 draft and final agreements are completely fraudulent "[s]o, you can't rely on the HUD-1's where they say they paid from buyer's funds, because they are false."  However, plaintiffs continue to rely on the HUD-1s to argue the amount of equity in the home and the amount lost to plaintiffs.

[20] Mr. Eisenberg's affidavit states that the use of the "respecting plaintiff's equity in the respective plaintiff's residence(s) for two purposes: a. To pay all settlement costs, and b. The remainder to be distributed to the indicted and unindicted co-conspirators."  Affidavit of Stuart Eisenberg at 5.  The court notes that while the affidavits provided by plaintiffs are evidence of how their equity was used, affidavits of counsel can never support a summary judgment motion under Rule 56(e) as there can be no personal knowledge despite Mr. Eisenberg's contention.

[21] Mr. Thomas stated in his affidavit that any payments marked "'From Buyer's Funds' were falsified because those payments were actually coming from the Plaintiffs'/Sellers' equity."  Affidavit of John R. Thomas at 3.  Mr. Briana

provided no additional support to show that the equity in their homes was used to purchase the title insurance. Although the plaintiffs' equity may have been used to fund all the costs associated with settlement, I do not find that this fact alone makes them purchasers under the UTPCPL.

Plaintiffs did not know what Fidelity was and had no idea the transaction for the purchase of title insurance was taking place. Plaintiffs were actually the sellers of the property and attempted to frame the situation to fit within the statute much like the plaintiff in DeFazio. Under Defazio, the definition of "purchaser" is "one that acquires property." Defazio, 836 A.2d at 939. Plaintiffs also admit that they did not receive a good which, in this case, would be the title insurance policy. This is consistent with the fact that the plaintiffs were sellers of the property under these agreements. The seller of property has no need to be protected by a title insurance policy, nor does a seller have any reason to purchase a policy for a property which will be purchased by another party. It is the buyer and the lender that will benefit from a title insurance policy like the one issued by defendant.[22] See Rood v. Commonwealth Land Title Ins. Co., 936 A.2d 488, 493 (Pa.

---

stated that plaintiffs' equity was used to "pay the cost of the transaction, including but not limited to all settlement charges." Affidavit of John Briana at 4; see also Direct Examination of Mr. John Briana, Plaintiffs' Exhibit D at 20. Mr. Bennett stated that, "It is my understanding that the Seller receives no cash at closing … all expenses are paid at closing funded with the Seller's equity from the real estate." Affidavit of Jeffrey Bennett at 3.

[22] This case is factually similar to some remortgage scheme cases brought under the UTPCPL where the court liberally construed the buyer-seller relationship. For example, in In re Fowler, 425 B.R.157 (Bankr. E.D. Pa. 2010), defendant Rauso contacted and met with plaintiff, Ms. Fowler, offering to help her to stop the loss of her home to foreclosure. Id. at 164. Thereafter, Rauso orchestrated a foreclosure-avoiding transaction whereby Fowler and her husband transferred title to their home to Rauso for no consideration, granted a $60,000 mortgage on the home to a company that Rauso controlled, and then leased the home back from Rauso with an option to repurchase within one year. Id. When the Fowlers subsequently attempted to rescind the transaction, relying on the protections of 73 Pa. Stat. Ann. § 201-7, Rauso resisted, contending that they had no right to rescind because they were not "buyers" within the meaning of that term in § 201-7 but, rather, were "sellers." Id. at 188.

Super. 2007) (finding that title insurance is designed to protect the buyer of a property from loss arising for defects in title that the buyer acquires). Title insurance policies were issued as a necessary course of these transactions as they would have been in any conveyance of this kind.

Although there is at least some evidence on both sides that tends to show what funds were used to pay the title insurance, either the plaintiffs' equity or the mortgage financing provide by the lenders, the payment of the title insurance on the HUD-1's was no different from the multitude of other "settlement charges" such as those for hazardous insurance, real estate taxes, and other fees. These expenses were all legitimate non-fraudulent purchases related to the sale of plaintiffs' homes.[23] The title insurance, the hazard insurance, and the payment for taxes continued to be identically reflected on the Final HUD-1's, but various liens that are allegedly invalid and fraudulent were added and

---

The court rejected this argument on summary judgment, explaining that the record evidence demonstrated that the Fowlers "dealt with Rauso as 'buyers' interested in 'purchasing' Rauso's 'services' - i.e., his assistance in avoiding foreclosure on and permanent loss of" their property. Id. The court first found that the defendant marketed himself to the Fowlers "as a person possessed of certain unique training, contracts, and information that would make him and his services valuable to homeowners interested in avoiding foreclosure." Id. Second, "in entering the transaction with Rauso, [the Fowlers] never had the slightest interest in selling the[ir] Property," and were only "convinced to enter into the transaction after Rauso pitched the idea that the temporary transfer of title to the . . . Property . . . would help [them] avoid foreclosure and keep the property in the long term." Id. at 188-89. Third, Rauso never paid anything to the Fowlers in consideration for obtaining title to their property, whereas the Fowlers transferred things of value to both Rauso and corporations that he owned and controlled. Id. at 189. The court therefore concluded that "for purposes of § 201-7 of the UTPCPL, . . . [the Fowlers] were 'buyers' of Rauso's foreclosure intervention and prevention services." Id. (citation omitted).

Fowler gives some perspective on the twist of the buyer-seller relationship. However, in this action, plaintiffs have not brought suit against Bennett and Doherty. The considerations that the Fowler court examined are simply not present in the relationship between Fidelity and plaintiffs. Fidelity had no contact with plaintiffs, provided no good or service to plaintiffs, and there is no evidence that plaintiffs suffered any harm from the valid title insurance policy issued by Fidelity to J.P. Morgan.

[23] Additionally, the HUD-1's illustrate that these settlement charges were due from the borrower not plaintiffs.

reduced the plaintiffs "cash to seller" to zero.[24]  Because the settlement expenses continue

to be valid policies and payments, the real source of the plaintiffs' losses stem from the

fraudulent liens added to the Final HUD-1's and reducing the "cash to seller" to zero.

The policy behind the UTPCPL is to place buyers and sellers on equal footing,

remedy any unequal bargaining power "of opposing forces in the marketplace," and

"ensure fairness of market transactions."  Katz, 972 F.2d at 55 (quoting Commonwealth

v. Monumental Properties, 329 A.2d 812 (Pa. 1974)).  In Katz, the court found that

although strict privity is not required, the statute was not intended to extend the private

cause of action to a plaintiff lacking any commercial dealings with the defendant.  Id.

In this case, Fidelity had no bargaining power over plaintiffs because it did not sell

anything to them.  There was no commercial bargaining or exchange.  Fidelity sold title

insurance to the buyers and lenders involved in the transaction, regardless of whether the

transactions were financed indirectly through the plaintiffs' equity.  Plaintiffs did not

even know who Fidelity was, had no contact with Fidelity, let alone that which could be

considered deceptive.[25]  Finally, plaintiffs never received a good or service from Fidelity.

Plaintiffs simply cannot be considered purchasers of title insurance from Fidelity.  See

Schwarzwaelder, 895 A.2d at 620 (holding that the plaintiffs purchased no service or

---

[24] For example, on the final HUD-1 for a transaction with Susan Edge, a plaintiff in the case, there was a draft HUD-1 that reflects certain settlement charges and the cash to seller is reflected as $144, 972.88.  The final HUD-1 then adds a payoff to New Horizon Reality Acquisition, which is alleged to be a fraudulent lien, the cash to seller has been brought down to zero, but the title insurance charge and other settlement charges remain the same.  See Defendant's Exhibits 49 and 52 to the Motion for Summary Judgment.

[25] See Canty v. Equicredit Corp. of Am., No. 01-5804, 2003 WL 21243268, at *3 (E.D. Pa. May 8, 2003) (stating that a defendant cannot be held "derivatively liable" under the UTPCPL for the fraudulent actions of a third party when "plaintiff fails to allege or present any evidence that [the defendant] ever knowingly engaged in misrepresentation"); Weinberg v. Sun Co., 777 A.2d 442, 446 (Pa. 2001) (noting that a UTPCPL plaintiff must demonstrate that he justifiably relied on the defendant's deceptive practice and that he suffered harm as a result of that reliance).

product through the indirect transfer of funds to the buyer and cannot claim an attendant cause of action under the UTPCPL).

2. <u>Damages and Justifiable Reliance</u>

Defendant relies on the argument that plaintiffs cannot show justifiable reliance on any deceptive conduct or misrepresentation on the part of Fidelity because plaintiffs and Fidelity never interacted. Therefore, Fidelity could not have made a material misrepresentation.

Even if the plaintiffs were "purchasers" under the act, they cannot show that they were damaged as a result of the title insurance policy issued by Fidelity nor have plaintiffs demonstrated the necessary element of justifiable reliance. The Supreme Court of Pennsylvania has consistently interpreted the UTPCPL's private-plaintiff standing provision's causation requirement to demand a showing of justifiable reliance, not simply a causal connection between the misrepresentation and the harm. <u>Hunt v. United States Tobacco Co.</u>, 538 F.3d 217, 227 (3d Cir. Pa. 2008).

Due to the causation requirement in the UTPCPL's standing provision, 73 Pa. Cons. Stat. § 201-9.2(a) (permitting suit by private plaintiffs who suffer loss as a result of the defendant's deception), a private plaintiff pursuing a claim under the statute must prove justifiable reliance on the misrepresentation or wrongful conduct resulting injury.[26]

<u>See</u> <u>Hunt</u>, 538 F.3d at 221; <u>Kondratick v. Ben. Consumer Discount Co.</u>, No. 04-4895,

---

[26] "The Pennsylvania Supreme Court has not recognized any exceptions, and has applied this rule in a variety of situations. The Pennsylvania Superior Court has applied the Pennsylvania Supreme Court's standing rule to the post-1996 catch-all provision, and the United States Court of Appeals for the Third Circuit has interpreted the rule to apply to all UTPCPL subsections." <u>Hunt</u>, 538 F.3d at 221 (citing <u>Debbs v. Chrysler Corp.</u>, 810 A.2d 137, 156-58 (Pa. Super. 2002); <u>Sexton v. PNC Bank</u>, 792 A.2d 602, 607-08 (Pa. Super. 2002), and <u>Santana Prods., Inc. v. Bobrick Washroom Equipment, Inc.</u>, 401 F.3d 123, 136 (3d Cir. 2005)).

2005 U.S. Dist. LEXIS 20915 (E.D. Pa. Sept. 21, 2005); Toy v. Metro. Life Ins. Co., 863 A.2d 1 (Pa. Super. 2004), aff'd by 928 A.2d 186 (Pa. 2007). Specifically, plaintiffs retain the burden of establishing a causal connection to or reliance on the alleged misrepresentations of a defendant. Toy, 863 A.2d at 10.

Plaintiffs also fail to show that the title insurance policies form the basis for their claim for relief against Fidelity. In fact, it was the underlying fraud of the HUD-1 scheme, not the title insurance, which caused the plaintiffs' harm. Because the fraudulent acts that form the predicate of plaintiffs' claims under the UTPCPL are unrelated to the purchase of title insurance, plaintiffs could not have been damaged through the purchase of title insurance. The scheme perpetrated by the scam artists, who have been criminally charged and civilly sued, is the exclusive source of plaintiffs' harm. Plaintiffs failed to show any deceptive conduct by Fidelity with regard to the issuance of the title insurance and, consequently, cannot show that they justifiably relied on any allegedly deceptive conduct by Fidelity.

In Schwartz v. Lawyers Title Ins. Co., 680 F. Supp. 2d 690 (E.D. Pa. 2010), discussed above, the court held that the plaintiffs' satisfied the elements of common law fraud by alleging that the company fraudulently misrepresented amounts owed for title insurance and that plaintiffs justifiably relied upon the veracity of the HUD-1 statement and on the misrepresentation that the HUD-1 reflected the proper rates to which the company was lawfully entitled.

Here, even if the plaintiffs had purchased the title insurance policy, there is no claim that plaintiffs overpaid for the title insurance policy or that they relied on a

misrepresentation about the title insurance policy. There is also no evidence that the title insurance policy was anything but valid and remains in place to this day. I am not persuaded that plaintiffs can be considered purchasers simply because a title insurance policy was part of the same transaction where plaintiffs sold their homes; however, no matter the source of funding, the plaintiffs had no contact with Fidelity such that they could have justifiably relied on any deceptive conduct. Moreover, it was the buyers and the lenders who were issued and protected by defendant's title insurance policies and likewise could have been "injured" by them. Plaintiffs simply cannot show any harm as a result of the valid policies issued.

Plaintiffs contend that Fidelity is liable for deceptive conduct through the actions of its closing agent First County, because First County acted with express authority on the terms of the agency agreement between itself and Fidelity. "'An agency relationship is created when one party consents to have another act on its behalf, with the principal controlling and directing the acts of the agent.'" AT&T Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1434 (3d Cir. 1994) (quoting Sears Mortg. Corp. v. Rose, 634 A.2d 74, 79 (N.J. 1993)). Vicarious liability due to an agency relationship can be based on the agent's actual authority. "An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." RESTATEMENT (THIRD) OF AGENCY § 2.01 (2006).

"'Vicarious liability can also be based on apparent authority.'" Apparent authority arises in those situations where the principal causes persons with whom the agent deals to

reasonably believe that the agent has authority' despite the absence of an actual agency relationship." <u>Winback</u>, 42 F.3d at 1439 (quoting <u>Barticheck v. Fidelity Union Bank/First Nat'l State</u>, 680 F. Supp. 144, 148-49 (D.N.J. 1988)).

Plaintiffs argue that Fidelity engaged in deceptive practices through its agents. Plaintiffs allege that Fidelity was principle in the relationship with First County and the agency relationship existed because there was prior authorization and Fidelity ratified the relationship by condoning First County's action—selling the title insurance—after the fact.[27] Plaintiffs argue that Fidelity ratified the actions because it kept the benefit of the contracts by retaining the premiums after there were criminal actions taken up as a result of the fraudulent transactions.

Further, they argue that, as a title insurance company, Fidelity had an obligation—prior to issuing a policy of title insurance—to be aware of the liens and encumbrances against the real property and had an affirmative duty to inquire, to question, and to determine whether there are any liens or encumbrances against a property before issuing the policy insuring against unsatisfied liens and encumbrances.[28] Plaintiffs also argue that Fidelity had a duty to discover and disclose the fraud.[29]

---

[27] At oral argument, plaintiffs' counsel noted that when Fidelity learned of the indictment, it immediately terminated Bennett & Doherty.

[28] At oral argument, plaintiffs' counsel argued that the settlements immediately vest and become owned by Fidelity, yet Fidelity did nothing to inspect the transactions and it failed to discover the fraud and alert the plaintiffs. Plaintiffs went on to argue that Fidelity's only interest was to determine "whether or not it was getting its money." Transcript of Oral Argument at 26 (Aug. 1, 2013). In arguing this point, plaintiffs cited the deposition of Fidelity representative Laura Fox. Plaintiffs' Exhibit CC.

Ms. Fox stated that Fidelity does not have any written protocol or policies regarding the selection, oversight, auditing of an authorization to agents and agencies for the issuance of title policies. She indicated that the specifications would be detailed in the agent's contract, but the process was very informal and frequently she or others would approve underwriting contracts through email, fax, or phone. <u>Id.</u> at 29. She also stated that the

Defendant argues that First County cannot be considered an agent of Fidelity, which would impute liability under an agency or *respondeat superior* theory of liability, because First County was exclusively employed as a title agent for Fidelity and any fraudulent conduct was outside the scope of the agency relationship.

I find there is insufficient evidence that an agency relationship existed between First County and Fidelity for anything outside the scope of selling title insurance. In order to impute liability, plaintiffs must demonstrate that acts by First County far beyond a simple showing employment. Plaintiffs' brief is anemic regarding factual support and case law on the issue of an agency relationship. Plaintiffs argue that there is nothing in the case to indicate that Fidelity "did not accept, denigrate, or disparage the acts done by the conspirators." However, plaintiffs offer no evidence to support that liability should be imputed to defendant.

The authority provided to First County was expressly limited to its role as a policy agent for Fidelity. The agency agreement between First County and Fidelity specifically

---

financial audits were not her responsibility and that title agents were not typically indicted. She mentioned that some agents may have had financial trouble, but the typical issue was that the agent would take the settlement money and the lender or customer would alert Fidelity. Following an alert like this, Fidelity would follow up with the agent and then send the case to the audit team to look into the financials. Ms. Fox also mentioned that "one thing Fidelity does that's different [from Lawyer's Title]" is that "every counsel has to do five underwriting audits every year of agents" but that process was not conducted during the 2004-2006 timeframe. Id. at 31. She concluded by explaining that Fidelity is not responsible for the settlement in these, and other transactions, and does not compare the draft and final HUD-1's. Id. at 38-39.

[29] I first note that plaintiffs are reaching in their argument that Fidelity had some type of duty to inspect and disclose which would impact the UTPCPL claim. Plaintiffs have not filed a breach of contract or negligence claim against defendant. The claim is under the UTPCPL, which simply does not protect claims like this made by plaintiffs. Courts have long held that, while the UTPCPL "encompasses a wide variety of misfeasance," there is no support in the statute for nonfeasance claims. See, e.g., Parasco v. Pacific Indem. Co., 920 F. Supp. 647, 656 (E.D. Pa. 1996) (holding that mere failure of insurance company to pay additional living expenses under an insurance policy "is nonfeasance and therefore not actionable under the [UTPCPL]"); Fass v. State Farm Fire & Cas. Co., No. 06-02398, 2006 U.S. Dist. LEXIS 51478, *7 (E.D. Pa. July 27, 2006) ("[T]he UTPCPL only protects plaintiffs against a defendant's malfeasance; nonfeasance is not covered by the statute."); Gordon v. Pa. Blue Shield, 548 A.2d 600, 604 (Pa. Super. 1988) (holding that nonfeasance is a failure to perform a contractual obligation).

notes that the "Principal appoints Agent it agent solely for the purpose of issuing, on Principal's forms, title insurance commitments, policies, and endorsements on a non-exclusive basis with reference to real estate located in the Commonwealth of Pennsylvania." See Exhibit A to Defendant's Motion for Summary Judgment; see also Plaintiffs' Exhibit CC-1. It goes on to say that the "Agent shall quote, charge, and collect title insurance premiums" and "receive and process applications for title insurance in a timely, prudent and ethical manner." Id. at 1-2. The agreement states that the "Agent shall not, without written approval of the Principal…commit Principal to a risk…which Agent knows is to be based upon disputed title." Id. at 2. Finally, the agreement makes note that "any escrow or closing business conducted by Agent is not within the scope of this Agreement…."

The payoff liens and encumbrances by First County in connection with the transaction at issue were undertaken in First County's role as a closing agent. Fidelity is an underwriter of title insurance who relies on its agents, here First County, to evaluate title to the property. In this case, Fidelity dealt with crooks, as did plaintiffs. Fidelity's participation in the contract did not even occur until after the premium was remitted and the current title insurance policies that were issued to the purchasers of the properties are still open. Not to mention, Fidelity could not have been understood to give apparent authority because it had no contact with plaintiffs nor did plaintiffs know who Fidelity was—a fact which plaintiffs concede. Although it is unfortunate that plaintiffs were deceived by Bennett, Doherty, and the other "players" in this scheme, there is simply nothing in the record to suggest that plaintiffs' damages were caused by a reliance of any

deceptive conduct by Fidelity.  The actions of the title agents cannot be imputed to

Fidelity and there is no causal link between the policies issued by Fidelity and the

damages alleged by plaintiffs.

## IV.  Plaintiffs' Claim for Civil Conspiracy[30]

In order to establish liability for civil conspiracy, a plaintiff must show that: (1)

two or more defendants conspired with a common purpose to do (a) an unlawful act, or

(b) a lawful act by unlawful means or for an unlawful purpose;[31] (2) defendants

committed an overt act in furtherance of the conspiracy; and (3) the plaintiff suffered

legal damages as a result of the overt act committed in furtherance of the conspiracy.

Weaver v. Franklin Cnty, 918 A.2d 194, 202 (Pa. Commw. 2007).  For purposes of this

claim, the phrases "unlawful act" and "lawful act by unlawful means or for an unlawful

purpose" refer to acts that are independently actionable under Pennsylvania law.

Pelagatti v. Cohen, 536 A.2d 1337, 1342 (Pa. Super. 1987).  Absent a civil cause of

action for a particular act, there can be no cause of action for civil conspiracy to commit

that act.  A claim for civil conspiracy cannot stand without some underlying act which is

actionable in and of itself.  McKeeman v. Corestates Bank, N.A., 751 A.2d 655, 660 (Pa.

Super. 2000).  Because plaintiffs have not alleged an underlying tort, they cannot

maintain a civil conspiracy action.  Further, even if the plaintiffs had successfully alleged

an agency relationship existed, they could not state a cause of action for civil conspiracy.

---

[30] "Once an underlying tort has been alleged, only a finding that the underlying tort has occurred" will support a claim for civil conspiracy.  Boyanowski v. Capital Area Intermediate Unit, 215 F.3d 396, 405 (3d Cir. 2000).

[31] Civil conspiracy requires an agreement and either a criminal act or intentional tort.  See Boyanowski, 215 F.3d at 406 (applying Pennsylvania law and reversing judgment for civil conspiracy).

Under the "intracorporate conspiracy doctrine," a conspiracy under Pennsylvania law cannot arise between a principal and its agent because of the nature of the relationship.[32] See Nix v. Temple Univ. of Commonwealth Sys. of Higher Educ., et al., 596 A.2d 1132, 1137 n. 3 (Pa. Super. 1991).

## V.    Conclusion

For the reasons discussed above, I will grant defendant's motion for summary judgment.

An appropriate Order follows.

---

[32] It is well-settled that a corporation cannot conspire with its subsidiaries, its agents, or its employees. Michael v. Shiley, Inc., No. 93-1729, 1994 U.S. Dist. LEXIS 1973, at *46-47 (E.D. Pa. Feb. 25, 1994) (granting summary judgment to defendants on state law conspiracy claim involving alleged conspiracy between parent and subsidiary); Glessner v. Kenny, 952 F.2d 702, 710 (3d Cir. 1991). This is known as the "intracorporate conspiracy doctrine." See Gen. Refractories Co. v. Fireman's Fund Ins. Co., 337 F.3d 297, 313 (3d Cir. 2003) (applying Pennsylvania law) (citing Heffernan v. Hunter, 189 F.3d 405, 413 (3d Cir. 1999)).

Plaintiffs cite the exception to the intracorporate conspiracy doctrine applicable when "the employees have acted for their sole personal benefit." Heffernan, 189 F.3d at 412. Plaintiffs maintain that Bennett and Doherty acted for their own personal benefit when they received kickbacks outside their employment as title agents. However, this argument inherently contradicts plaintiffs' contentions that Bennett and Doherty were acting within the scope of the agency relationship with Fidelity.

In the context of the intracorporate conspiracy doctrine, the challenged activity may violate the canons of ethics, but so long as it is within the scope of representation, it does not eliminate the exemption from a conspiracy charge. Id. at 412-13 (holding that a conspiracy between a corporation and an officer may exist only "if the officer is acting in a personal, as opposed to official, capacity"). Therefore, an exception exists "when the employees have acted for their sole personal benefit … [h]owever, … the mere fact that attorneys have 'mixed motives,'… does not remove their conduct from the scope of the agency." Id. at 412-13. It follows that unless an agent is "acting in a purely personal capacity," the intracorporate conspiracy doctrine applies. Sung Tran v. Delavau, LLC, No. 07-3550, 2008 WL 2051992, at *11 (E.D. Pa. May 13, 2008) (citing Gen. Refractories Co., 337 F.3d at 313).

Whether or not Bennett and Doherty gained any personal benefit from their actions, as title agents for Fidelity, plaintiffs argue, on one hand, that their actions fell within the agency relationship and, on the other, that the intracorporate conspiracy doctrine does not apply because they acted entirely apart from the agency relationship. As I discussed above, I find that the fraudulent actions were completely outside the relationship with Fidelity to sell title insurance. Moreover, as there is no underlying tort, plaintiffs' civil conspiracy claim fails.